No. 23-20095

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**Shanon Roy Santee,**
*Plaintiff–Appellant,*

**v.**

**Oceaneering International, Incorporated; Transocean Offshore
Deepwater Drilling, Incorporated; Chevron USA, Incorporated,**
*Defendants–Appellees.*

On Appeal from the United States District Court
for the Southern District of Texas
No. 4:21-CV-3489, Hon. David Hittner, *Presiding Judge*

OPENING BRIEF FOR PLAINTIFF–APPELLANT

Kurt B. Arnold
Andrew R. Gould
  *Counsel of Record*
Brian M. Christensen
ARNOLD & ITKIN LLP
6009 Memorial Drive
Houston, Texas 77007
(713) 222-3800 Telephone
(713) 222-3850 Facsimile

**Counsel for Plaintiff–Appellant
Shanon Roy Santee**

## Certificate of Interested Persons

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

| Appellant | Appellees |
|---|---|
| Shanon Roy Santee | Oceaneering International, Inc.<br>Transocean Offshore Deepwater Drilling, Inc.<br>Chevron USA, Inc. |
| **Counsel for Appellant**<br><br>Kurt B. Arnold<br>Andrew R. Gould<br>Brian M. Christensen<br>J. Kyle Findley<br>John G. Grinnan, Jr.<br>Trevor M. Courtney<br>ARNOLD & ITKIN LLP<br>6009 Memorial Drive<br>Houston, Texas 77007 | **Counsel for Appellees**<br><br>Thomas C. Wright<br>Raffi Melkonian<br>Kelley Clark Morris<br>WRIGHT CLOSE & BARGER, LLP<br>One Riverway, Suite 2200<br>Houston, Texas 77056<br><br>*Counsel for all Appellees*<br><br>Robert L. Klawetter<br>Christina K. Schovajsa<br>EASTHAM, WATSON, DALE & FORNEY, LLP<br>808 Travis Street, Suite 1300<br>Niels Esperson Building<br>Houston, TX 77002<br><br>*Counsel for Transocean Offshore Deepwater Drilling, Inc.* |

| | Michael Anthony Golemi |
| --- | --- |
| | Alma Shields |
| | Jody M. Schisel-Meslin |
| | LISKOW & LEWIS |
| | 1001 Fannin Street, Suite 1800 |
| | First City Tower |
| | Houston, TX 77002 |
| | |
| | *Counsel for Chevron USA, Inc.* |
| | |
| | Alejandro Mendez-Roman |
| | Thomas R. Nork |
| | HOLMAN, FENWICK & WILLAN USA, LLP |
| | 5151 San Felipe Street, Suite 400 |
| | Houston, Texas 77056 |
| | |
| | Michael John Wray |
| | SQUIRE PATTON BOGGS (US), LLP |
| | 600 Travis Street, Suite 6700 |
| | Chase Tower |
| | Houston, Texas 77002 |
| | |
| | *Counsel for Oceaneering International, Inc.* |
| **Magistrate Judge** | |
| Peter Bray | |
| **District Judge** | |
| David Hittner | |

Respectfully Submitted,

s/ Andrew R. Gould
Andrew R. Gould
*Attorney of Record for Plaintiff–Appellant*

Shanon Santee respectfully requests oral argument. This appeal raises several important legal questions on federal removal jurisdiction, including forfeiture by not raising a ground for removal, the fraudulent-pleading standard, and Jones Act "seaman" status. Though these significant issues alone merit argument, the appeal also raises nuanced, fact-specific questions about a vessel owner's duty to maritime workers under (and apart from) the Longshore Act, and the circumstances under which an entity demonstrates operational control over its contractor. Oral argument will substantially assist the Court in resolving these numerous legal issues.

# Table of Contents

Certificate of Interested Persons .................................................... ii

Statement regarding Oral Argument .......................................... iv

Table of Authorities .................................................................. ix

Abbreviations and References.................................................. xvi

Introduction ............................................................................. 1

Statement of Jurisdiction........................................................... 4

Statement of the Issues.............................................................. 5

Statement of the Case................................................................ 6

I.     For five years, Santee worked almost exclusively on Transocean's ship, where he assisted with drilling and was integrated into the vessel's crew. ...................................................................... 6

     A.     Santee worked on the *Deepwater Conqueror* for 763 out of 788 working days in the five years before his injury. ................ 8

     B.     Chevron and Transocean together owned, operated, supervised, and authorized Oceaneering's work on the *Deepwater Conqueror*.................................................. 9

     C.     Santee is severely injured while working aboard the vessel. ............................................................................ 10

II.    After wrongly refusing to remand this lawsuit to state court, the district court grants summary judgment to Defendants.................... 14

     A.     Santee sues in Texas state court and Defendants remove......... 14

     B.     The district court declines to remand. ..................................... 15

C. The court grants summary judgment for Oceaneering on the sole ground that Santee is not a Jones Act seaman. ...........16

D. The court then grants summary judgment for Chevron and Transocean, while denying Santee's motions to compel crucial discovery and for a continuance. ..................16

Summary of the Argument .........................................................19

Argument ................................................................................24

I. The district court wrongly denied Santee's motion to remand. ..........24

A. Claims filed in state court under the Jones Act, like Santee's here, are nonremovable. ..........................................................24

B. Defendants forfeited their fraudulent-pleading ground by failing to mention it anywhere in their notice of removal. .......27

C. Regardless, the district court misapplied the fraudulent-pleading standard to conclude that there is no possibility that Santee could prove his seaman status. ..............................29

1. A court may grant remand only when there is no possibility that a plaintiff might in the future (including with the benefit of discovery) prove he is a seaman. ...........29

2. A Jones Act seaman must have a substantial connection to a vessel and contribute to its functions. ...........................30

3. Santee is a "seaman" because of his five-year deployed, sea-based work on the *Deepwater Conqueror*. .......................34

4. Especially under the fraudulent-pleading standard, denying Santee's motion to remand was improper. .............39

D.      OCSLA provides no basis for removal because Santee was not injured on an Outer Continental Shelf situs. ...................... 41

II.    The district court erred in granting Oceaneering's motion for summary judgment, which rested solely on its erroneous Jones Act conclusion. .................................................................... 45

III.   The district court erred in granting summary judgment for Transocean, which breached its *Scindia* duties. .................................. 47

A.      Transocean owed and breached its active-control duty and its duty to intervene. .................................. 49

B.      Transocean also breached its turnover duty. ............................ 53

C.      Transocean is liable for unseaworthiness because Santee was performing a seaman's work. ............................................. 55

D.      Alternatively, the district court abused its discretion in denying Santee's motion for continuance to obtain necessary discovery to oppose Transocean's motion. .............. 57

IV.    The district court erred in granting summary judgment for Chevron, as genuine issues of material fact exist as to its control over the vessel. .................................................................... 60

A.      Chevron owed a duty to Santee because it contractually authorized and controlled Santee's work. ................................. 60

B.      Chevron's actual conduct demonstrated control and authorization of Oceaneering's negligent work. ....................... 64

C.      Chevron breached its duty to ensure the safety of Santee's work. ......................................................................... 66

D.      Chevron is liable for unseaworthiness because of the control it exerted over the vessel, or at minimum genuine issues exist. ....................................................................... 67

E.    Alternatively, the district court abused its discretion in denying Santee's motion for continuance...................................68

Conclusion.....................................................................................70

Certificate of Service.....................................................................71

Certificate of Compliance ...........................................................72

## Cases

*Access Telecom, Inc. v. MCI Telecomms. Corp.*,
    197 F.3d 694 (5th Cir. 1999) ................................................................. 59

*Acuna v. Brown & Root Inc.*,
    200 F.3d 335 (5th Cir. 2000) ................................................................ 44

*Am. Family Life Assurance Co. v. Biles*,
    714 F.3d 887 (5th Cir. 2013) ............................................ 58, 59, 60, 69

*Aparicio v. Swan Lake*,
    643 F.2d 1109 (5th Cir. 1981) .............................................................. 56

*Barker v. Hercules Offshore, Inc.*,
    713 F.3d 208 (5th Cir. 2013) ......................................................... 41, 42

*Barlow v. BP Expl. & Prod., Inc.*,
    620 F. Supp. 3d 475 (E.D. La. 2022) ........................................... passim

*Becker v. Tidewater, Inc.*,
    335 F.3d 376 (5th Cir. 2003) ........................................... 25, 26, 29, 41

*Belliveau v. Barco, Inc.*,
    987 F.3d 122 (5th Cir. 2021) ........................................................ passim

*Boutte v. Yamaha Motor Corp., U.S.A.*,
    No. 3:13-CV-166, 2013 WL 3816585 (S.D. Tex. July 22, 2013) ........... 42

*Brock Services, L.L.C. v. Rogillio*,
    936 F.3d 290 (5th Cir. 2019) ............................................................... 63

*Burchett v. Cargill*, 48 F.3d 173 (5th Cir. 1995) ....................................... 39

*Burks v. Am. River Transp. Co.*, 679 F.2d 69 (5th Cir. 1982),
    *abrogated on other grounds by*
    *Lozman v. City of Riviera Beach, Fla.*, 568 U.S. 115 (2013) ............26, 56

*Camsoft Data Sys., Inc. v. S. Elecs. Supply, Inc.*,
    756 F.3d 327 (5th Cir. 2014) ..............................................................45

*Canady v. Bossier Par. Sch. Bd.*,
    240 F.3d 437 (5th Cir. 2001) ..............................................................58

*Chandris, Inc. v. Latsis*,
    515 U.S. 347 (1995) ...................................................................... passim

*Chiasson v. Brand Energy Sols., LLC*,
    439 F. Supp. 3d 816 (W.D. La. 2020) .................................................61

*Colonial Oaks Assisted Living Lafayette, L.L.C. v. Hannie Dev., Inc.*,
    972 F.3d 684 (5th Cir. 2020) ................................................................6

*Davidson v. Georgia-Pac., L.L.C.*,
    819 F.3d 758 (5th Cir. 2016) .............................................30, 34, 39, 40

*Denson v. Diamond Offshore Co.*,
    955 So. 2d 730 (La. App. 4 Cir. 2007) ......................................62, 65, 67

*Fields v. Pool Offshore, Inc.*,
    182 F.3d 353 (5th Cir. 1999) ..............................................................39

*Forrester v. Ocean Marine Indem. Co.*,
    11 F.3d 1213 (5th Cir. 1993) ..............................................................68

*Fruge ex. rel. Fruge v. Parker Drilling Co.*,
    337 F.3d 558 (5th Cir. 2003) ........................................................ passim

*Hall v. Diamond M Co.*,
    732 F.2d 1246 (5th Cir. 1984) ............................................................39

*Henderson v. Atmos Energy Corp.*,
No. 21-30046,
2022 WL 3657191 (5th Cir. Aug. 25, 2022) (per curiam) ...................61

*Houston Exploration Co. v. Halliburton Energy Servs., Inc.*,
269 F.3d 528 (5th Cir. 2001) ................................................................55

*Howery v. Allstate Ins. Co.*,
243 F.3d 912 (5th Cir. 2001) ...............................................................44

*Hoyt v. Lane Constr. Corp.*,
927 F.3d 287 (5th Cir. 2019) ..................................................27, 28, 30

*In re 4-K Marine, L.L.C.*,
914 F.3d 934 (5th Cir. 2019) ...............................................................25

*Kermarec v. Compagnie Générale Transatlantique*,
358 U.S. 625 (1959) .............................................................................56

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) ...............................................................................1

*Lackey v. Atlantic Richfield Co.*,
990 F.2d 202 (5th Cir. 1993) ...................................................26, 28, 29

*Landry v. Huthnance Drilling Co.*,
889 F.2d 1469 (5th Cir. 1989) .............................................................61

*LeJeune v. Shell Oil Co.*,
950 F.2d 267 (5th Cir. 1992) ...............................................................61

*Levene v. Pintail Enters.*,
943 F.2d 528 (5th Cir. 1991) ...............................................................47

*Lewis v. Lewis & Clark Marine, Inc.*,
531 U.S. 438 (2001) .............................................................................26

xi

*Louisiana v. Am. Nat. Prop. Cas. Co.*,
    746 F.3d 633 (5th Cir. 2014) .............................................................. 44

*Luwisch v. Am. Marine Corp.*,
    956 F.3d 320 (5th Cir. 2020) ............................................. 25, 55, 67, 68

*Manson Gulf, L.L.C v. Modern Am. Recycling Serv., Inc.*,
    878 F.3d 130 (5th Cir. 2017) ..................................................... 47, 53, 54

*McDermott Intern., Inc. v. Wilander*,
    498 U.S. 337 (1991). ........................................................................... 32

*Morris v. T E Marine Corp.*,
    344 F.3d 439 (5th Cir. 2003) .............................................................. 45

*Nexbank, SSB v. BAC Home Loan Servicing, LP*,
    No. 3:11-CV-00279-L,
    2011 WL 5182118 (N.D. Tex. Oct. 28, 2011) ....................................... 28

*Offshore Logistics, Inc. v. Tallentire*,
    477 U.S. 207 (1986) ............................................................................ 43

*Pacheco v. Am. Smelting & Ref. Co., Inc.*,
    2005 WL 1404152 (W.D. Tex. June 1, 2005) ....................................... 28

*Payano v. Envtl. Safety & Health Consulting Servs., Inc.*,
    778 F. App'x 313 (5th Cir. 2019) (per curiam) .................................... 47

*Perez v. Aquaterra Contracting, LLC*,
    593 F. Supp. 3d 444 (E.D. La. 2022) .............................................. 40, 41

*Pimental v. LTD Canadian Pac. Bui*,
    965 F.2d 13 (5th Cir. 1992) ....................................................... 48, 52, 59

*Prestenbach v. Glob. Intern. Marine, Inc.*,
    244 Fed. Appx. 557 (5th Cir. 2007) (per curiam) ................................ 56

*Raicevic v. Fieldwood Energy, L.L.C.*,
    979 F.3d 1027 (5th Cir. 2020) ............................................... 46

*Rivera v. Kirby Offshore Marine, L.L.C.*,
    983 F.3d 811 (5th Cir. 2020) ........................................ 56, 57

*Romero v. Cajun Stabilizing Boats Inc.*,
    307 F. App'x 849 (5th Cir. 2009) (per curiam) .............................. 48, 52

*Romero v. Int'l Terminal Operating Co.*,
    358 U.S. 354 (1959) ............................................... 45

*Rybolt v. Laborde Marine Lift*,
    No. 00-CV-3800, 2001 WL 263119 (E.D. La. Mar. 14, 2001) ............... 26

*Sanchez v. Smart Fabricators of Texas, L.L.C.*,
    997 F.3d 564 (5th Cir. 2021) (en banc) ........................................ passim

*Scindia Steam Navigation Co. Ltd. v. De Los Santos*,
    451 U.S. 156 (1981) ....................................... 17, 48

*Seas Shipping Co. v. Sieracki*,
    328 U.S. 85 (1946) ........................................ 26, 56

*Sebble on Behalf of Estate of Brown v. St. Luke's #2, LLC*,
    358 So.3d 1030 (La. App. 4 Cir., 2023) ................................ 55

*Ticer v. Imperium Ins. Co.*,
    20 F.4th 1040 (5th Cir. 2021) ........................................ 27, 28

*Travis v. Irby*,
    326 F.3d 644 (5th Cir. 2003) ............................................... 30

*Victoria Sanchez v. Am. Pollution Control Corp.*,
    542 F. Supp. 3d 446 (E.D. La. 2021) ........................................... passim

*Wallace v. Oceaneering Int'l*,
    727 F.2d 427 (5th Cir. 1984) ....................................... 32, 37

*Wells v. Minnesota Life Ins. Co.*,
   885 F.3d 885 (5th Cir. 2018) ........................................................45, 46

*Wessel v. Miraglia*,
   No. 4:04-CV-377-A,
   2004 WL 1943776 (N.D. Tex. Aug. 31, 2004) ...............................27, 28

*Whelan v. American Roll-On Roll-Off Carrier LLC*,
   No. CV-H-21-2750, 2022 WL 16722367 (S.D. Tex. Nov. 4, 2022) ........52

*Winfrey v. San Jacinto Cnty.*,
   481 F. App'x 969 (5th Cir. 2012) ........................................................60

**Statutes**

28 U.S.C. § 1291 ...................................................................................4

28 U.S.C. § 1331 ...................................................................................4

28 U.S.C. § 1333 .................................................................................45

28 U.S.C. § 1446(a) .............................................................................27

33 U.S.C. § 902(21) .............................................................................47

33 U.S.C. §§ 904, 905(a) ....................................................................26

33 U.S.C. § 905(a) ...............................................................................46

33 U.S.C. § 905(b) ...............................................................................55

43 U.S.C. § 1331 ...................................................................................4

43 U.S.C. § 1333(a)(1)(A) ...................................................................42

43 U.S.C. § 1333(a)(1)(A)(iii)-(iv) .......................................................43

43 U.S.C. §§ 1333(a)(1), 1349(b)(1) ..........................................................41

46 U.S.C. § 30104.......................................................................................24

**Rules**

Fed. R. App. P. 4(a)(1)(A).............................................................................4

Fed. R. Civ. P. 56(a) ...................................................................................45

Fed. R. Civ. P. 56(d) ......................................................................57, 58, 59

**Other Authority**

Transocean Ltd., Form 10-K, Annual Report (Feb. 23, 2022),
    *available at* https://bit.ly/3PqOpKD.......................................................4

**Abbreviations:**

*Chevron:* Defendant–Appellee Chevron U.S.A. Inc., an indirectly wholly owned subsidiary of publicly traded Chevron Corporation. ROA.108.

*Oceaneering:* Defendant–Appellee Oceaneering International, Inc.

*Transocean:* Defendant–Appellee Transocean Offshore Deepwater Drilling, Inc.

*Defendants:* All Defendants–Appellees (Chevron, Oceaneering, Transocean).

**References:**

The record on appeal is cited as "ROA.[page number]."

As Justice Scalia wrote long ago, "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). As part of the "presum[ption] that a cause lies outside this limited jurisdiction," federal courts may not "expand[]" their jurisdiction "by judicial decree[.]" *Id.* Yet the district court disregarded these bedrock principles when it refused to remand this nonremovable Jones Act case to state court.

The district court's conclusion reflects two critical mistakes, each of them fatal. *First*, despite the statutory requirement that a defendant must raise all grounds for removal in the notice of removal, it allowed Defendants to raise the ground that Shanon Santee fraudulently pleaded his Jones Act claims for the first time in their response to the motion to remand. Indeed, it did so while ignoring Santee's argument that Defendants had forfeited the ground. That error alone requires reversal.

*Second*, even assuming Defendants had properly raised fraudulent pleading as a ground for removal, the district court misapplied the fraudulent-pleading standard. A court may find fraudulent pleading under the Jones Act only when there is no possibility that a plaintiff might in the future (including with the benefit of discovery) prove he is a seaman. Defendants came

nowhere close to meeting their heavy burden on this score. Santee's work installing, operating, and maintaining the ROV system on the *Deepwater Conqueror* was integral to its deep-sea drilling mission. He demonstrated allegiance to the vessel by working almost exclusively on it in 21-day hitches at sea for nearly five years—more than 96 percent of his total working time. And his assignment to the vessel was *indefinite,* during which he ate and slept on the vessel, following orders from the vessel's captain and being integrated with its crew.

Ultimately, because this case is not properly in federal court—including under the Outer Continental Shelf Lands Act, even if the Jones Act somehow did not apply—this Court need not review the district court's subsequent summary-judgment rulings. But even were it to do so, the court's mistakes extended to these rulings. Summary judgment for Oceaneering rests on the faulty premise that Santee is not a Jones Act seaman. As to Transocean, the court ignored key evidence demonstrating Transocean's breach of its active-control, intervention, and turnover duties. And finally, the court failed to acknowledge Chevron's contractual and demonstrated authorization of Oceaneering's negligent cursor-pin changeout procedure.

This Court should correct these fundamental jurisdictional mistakes and reverse, vacate the district court's judgments, and order the case remanded to state court—where it has always belonged. Alternatively, it should reverse the court's orders granting Defendants' motions for summary judgment.

## STATEMENT OF JURISDICTION

This appeal arises from state-law claims brought in Texas state court under the Jones Act and general maritime law. ROA.17. Defendants improperly removed this case to federal court under the auspices of original jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA") (43 U.S.C. § 1331), federal-question jurisdiction (28 U.S.C. § 1331), and admiralty jurisdiction (*id.* § 1333). ROA.12; *see* ROA.414 (denying motion to remand).

After denying plaintiff's motion to remand and granting summary judgment to all defendants, the district court entered final judgment on February 16, 2023. ROA.414, 546, 2377, 2394. Plaintiffs timely appealed the same day. ROA.2398; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## Statement of the Issues

**I.**     Whether the district court erred in denying Santee's motion to remand when: **(1)** Defendants never raised fraudulent pleading under the Jones Act as a ground for removal; **(2)** forfeiture aside, Defendants failed to meet their heavy burden to demonstrate that Santee had no possibility of proving his Jones Act seaman status in the future, especially considering the contrary evidence; and **(3)** even if the Jones Act does not apply, Defendants' conclusory assertions do not establish OCSLA jurisdiction.

**II.**     Whether the court erred in granting Oceaneering's motion for summary judgment, when Santee's claims fall under the Jones Act—not the Longshore and Harbor Workers' Compensation Act.

**III.**     Whether the court erred in granting summary judgment for Transocean when it operated, controlled, and supervised the *Deepwater Conqueror*'s day-to-day operations, including through Transocean's captain, crew, offshore personnel, and onshore personnel.

**IV.**     Whether the court erred in granting summary judgment for Chevron when genuine issues of material fact exist as to Chevron's operational control over (or implied authorization of) Oceaneering's actions, as well as to its partial control of the vessel.

STATEMENT OF THE CASE

## I. For five years, Santee worked almost exclusively on Transocean's ship, where he assisted with drilling and was integrated into the vessel's crew.

In January 2021, 46-year-old Shanon Santee—a remote-operated vehicle ("ROV") technician working aboard a drillship 280 miles south of New Orleans—suffered a severe shoulder-and-neck injury while installing equipment on the vessel. ROA.244, 339, 2201. Disabled by his injury, he has undergone neck surgery and requires continued pain treatment. ROA.2203-04.

At the time of his injury—and for all but one year since 1999—Santee was employed as an ROV technician by Defendant Oceaneering International, Inc. ROA.505, 2204. Since 2016, he worked almost exclusively aboard the *M/V Deepwater Conqueror*, a drillship owned by an affiliate of Defendant Transocean Offshore Deepwater Drilling, Inc. ROA.245-48, 1269.[1] Oceaneering provided its services under a contract with Chevron. ROA.245, 774. Transocean and its affiliates provided the *Deepwater Conqueror*, the

---

[1] *See* ROA.1269 (Triton Conqueror GmbH owned vessel); Transocean Ltd., Form 10-K, Annual Report (Feb. 23, 2022), at 82 Ex. 21, *available at* https://bit.ly/3PqOpKD ("Transocean Annual Report"); https://bit.ly/43UVJm5 (Ex. 21, list of subsidiaries). *E.g.*, *Colonial Oaks Assisted Living Lafayette, L.L.C. v. Hannie Dev., Inc.*, 972 F.3d 684, 688 n.9 (5th Cir. 2020) (court may take judicial notice of documents in public record).

vessel's crew, and operated the vessel under a separate contract with Defendant Chevron U.S.A. Inc. ROA.339, 712, 1660.[2] Chevron's contracts with Transocean and Oceaneering aimed to further its exploration and production of hydrocarbons. ROA.339.

Oceaneering provides ROVs—unmanned robots that inspect and service underwater equipment, controlled by a person on a ship—to companies engaged in the exploration and development of oil and gas resources. ROA.241, 505. ROVs facilitate subsea exploration and development by (for example) inspecting and servicing subsea equipment and performing tasks human divers cannot perform. ROA.241, 2205.

Oceaneering deploys ROV technicians like Santee to install, operate, and maintain the ROV system during drilling. *See* ROA.242, 245. These technicians direct and control the ROVs from a command center aboard the vessel. ROA.242. They typically arrive at the vessel by helicopter and serve the vessel for a 21- or 28-day hitch. ROA.243. Because they support drilling

---

[2] Transocean's affiliate, Transocean Offshore Holdings Ltd., contracted with Chevron (ROA.339, 712; Transocean Annual Report at 82 Ex. 21); its affiliate Transocean Conqueror OPCO, Inc., employed the vessel's crew. *Id.*; ROA.1269. Defendant Transocean carried out activities including well construction and overall maintenance of the vessel under the contract with Chevron. *See, e.g.*, ROA.1660-61.

operations, ROV technicians sail with the vessel, including to new drilling locations. ROA.243.

## A. Santee worked on the *Deepwater Conqueror* for 763 out of 788 working days in the five years before his injury.

Santee began work on the *Deepwater Conqueror* in April 2016. ROA.245, 506. He then worked almost exclusively on that vessel for nearly the next five years until he was injured, for a total of 763 out of 788 total days worked—*i.e.*, more than 96 percent of his working hours. *See* ROA.245-48, 296-313, 506. He typically worked 21-day hitches, eating and sleeping aboard the vessel. *See* ROA.245-48, 506, 2216.

Santee's work entailed installing, operating, and maintaining the ROV system; supporting the *Deepwater Conqueror*'s sea-based drilling; and training for sea-based emergencies. ROA.505. While aboard the *Deepwater Conqueror*, he "reported directly to the company man for Chevron who was in charge of the vessel" and was integrated into the vessel's crew, including its chain of command. ROA.506. To that end, he "received orders and instructions from the captain of the vessel" and received orders from crew members as though they were above him in the same chain of command. ROA.506. He also supervised the two other technicians assigned to the ROV. ROA.507. His assignment was for an indefinite period of 21-day hitches (ROA.505, 2230)

and he understood that he was, "for all purposes, assigned to work on *that vessel*." ROA.506 (emphasis added).

Of Santee's 25 working days *not* on the *Deepwater Conqueror*, he trained for 8 days on land, spent 12 days working in Oceaneering's yard, worked a single day on another Transocean vessel (the *Deepwater Asgard*), and worked 4 days on another vessel. *See* ROA.245-48; Transocean Annual Report at 3.

**B. Chevron and Transocean together owned, operated, supervised, and authorized Oceaneering's work on the *Deepwater Conqueror*.**

To support the *Deepwater Conqueror*'s mission to explore and drill for hydrocarbons (ROA.358), Transocean and its affiliates operated, managed, and controlled the *Deepwater Conqueror*'s day-to-day operations, including through Transocean's captain, crew, onshore personnel, and offshore personnel. *See, e.g.*, ROA.2080-81, 2076, 2100, 2121-22, 2161, 2165, 2172, 2175, 2219.

Meanwhile, Chevron reserved contractual control over operations— including those of Oceaneering—and authorized and monitored the work onboard, including by requiring detailed standard operating procedures and mandating compliance with specific safety protocols. *See, e.g.*, ROA.1743-44, 1748-49, 1878-79, 1903.

### C.   Santee is severely injured while working aboard the vessel.

Santee's injuries occurred on the morning of January 11, 2021. That day, he was charged with removing and replacing rollers on an ROV cursor. ROA.2211. An ROV cursor is part of a launch and recovery system ("LARS"), which encases the ROV in a cage. ROA.2211 The LARS uses a deck, steel rollers, and other equipment to lower and retrieve the ROV from the sea. ROA.2156, 2211-12, 2027. The cursor and rollers fit over the top of the encaged ROV like an upside-down bowl and stabilizes the ROV during launch (ROA.2211):



ROA.945.

When a cursor or its rollers need repair, technicians first raise the cursor with a hydraulic power unit and winches. ROA.2211-12. When raised to the proper height, two technicians place cursor safety pins—30-pound, 27-inch steel pins that resemble oversized nails—into the cursor frame (ROA.2211-12, 2218, 2220, 2026):



ROA.2026.

The cursor pins support the cursor's weight to ensure it does not fall on technicians during repairs. ROA.2211-12.

Once the cursor is supported by the pins, the rollers may be replaced. ROA.2212. The rollers are "too heavy for one person" and even for the ROV technicians; the rollers typically require the assistance of rig roustabouts to remove and replace. ROA.2212.

The morning he was injured, Santee and his coworker were required to ascend ladders (placed at the edge of the LARS deck) to insert the cursor pins. ROA.315, 2023, 2214, 2220. The process required the crewmen to "reach back over head" to install the pin with one hand while stabilizing oneself with the other hand (ROA.2023, 2027):



ROA.2024.

After Santee ascended the ladder and strained to install the cursor pin, he felt and heard a painful "pop," followed by a "pinch/sharp pain" and

"ache" within his right shoulder. ROA.315, 2027, 2213-14. His coworker then assisted him in completing the installation. ROA.2217.

Santee reported his injury and sought treatment from the rig medic. ROA.2217, 2220. The captain of the vessel ordered Santee to stay in his living quarters, delaying him from submitting his paperwork documenting for two days after his injury. ROA.315, 350, 2219. His pain persisted and worsened over the next several days, ultimately disabling him, limiting his mobility, and requiring surgical fusion of vertebrae in his neck. ROA.2203-04, 2214, 2230

Although Santee had performed this task before, he was unsure of the safest method for the job. ROA.2219, 2230. A subsequent root-cause analysis revealed that his injury was caused by inadequate equipment (among other factors). ROA.2027. Rather than using improperly placed ladders, scaffolds or a platform "should have been built" to "pin the cursor safely" (ROA.2027):



ROA.2025.

## II. After wrongly refusing to remand this lawsuit to state court, the district court grants summary judgment to Defendants.

### A. Santee sues in Texas state court and Defendants remove.

In September 2021, Santee sued Oceaneering, Transocean, and Chevron in Texas state court under the Jones Act, general maritime law, and the Savings to Suitors Clause, alleging theories of negligence, gross negligence, and unseaworthiness against all defendants. ROA.17, 19-21. He requested a jury trial. ROA.22. He also alleged that Oceaneering had improperly failed to pay maintenance and cure. ROA.21-22.

With Oceaneering and Transocean's consent, Chevron removed on three grounds: original jurisdiction under OCSLA, federal-question jurisdiction, and general admiralty jurisdiction. ROA.12; *see* ROA.39, 41. Chevron never mentioned fraudulent pleading under the Jones Act as a ground for removal. *See* ROA.12.

### B. The district court declines to remand.

Santee moved to remand, essentially arguing that his claims are nonremovable because he is a "seaman" under the Jones Act regardless of OCSLA. ROA.115-23. In response, Oceaneering argued for the first time that Santee's Jones Act claims were fraudulently pleaded, giving the court exclusive jurisdiction under OCSLA. ROA.220-37. Chevron and Transocean made similar arguments. ROA.329-33. Beyond replying on the merits, Santee argued that the defendants had waived their fraudulent-pleading ground because it was not raised in their notice of removal. ROA.379.

The district court denied Santee's motion on two grounds. *First*, ignoring Santee's waiver argument, the court concluded that he was not a seaman (even though it conceded that Santee had met nearly every element of the governing test) and thus had fraudulently pleaded his Jones Act claims. ROA.423-27. *Second*, it determined that it had original jurisdiction under

OCSLA because the *Deepwater Conqueror* was attached to the seabed of the Outer Continental Shelf on the date of Santee's injury. ROA.427-29. Santee filed a detailed motion for reconsideration, which the court denied in a summary order. ROA.505-15.

## C. The court grants summary judgment for Oceaneering on the sole ground that Santee is not a Jones Act seaman.

Oceaneering moved for summary judgment, relying solely on the district court's prior holding that Santee was not a Jones Act seaman. ROA.432-36. As a result, Oceaneering argued, Santee's exclusive remedy was workers' compensation under section 905(a) of the Longshore and Harbor Workers' Compensation Act ("Longshore Act"). ROA.432-36.

Again refusing to reconsider Santee's seaman status, the district court agreed and granted Oceaneering's motion. ROA.546-52.

## D. The court then grants summary judgment for Chevron and Transocean, while denying Santee's motions to compel crucial discovery and for a continuance.

Chevron and Transocean separately moved for summary judgment. ROA.691, 938. Chevron argued that Santee's claims fail because (in its view) Chevron "owed no legal duty to protect Oceaneering employees, such as Plaintiff, from workplace hazards"—no matter its supervisory rights and effective operational control over Santee's work—and that Chevron did not

breach any duty in any event. ROA.692, 699-705. Chevron also argued that Santee's unseaworthiness claim failed because it "did not own or operate the Vessel[.]" ROA.706.

Relying on the district court's earlier conclusion that Santee was not a Jones Act seaman, Transocean argued that Santee's remedies were limited to those under the Longshore Act. ROA.943. It then argued that that it breached none of its three *Scindia* duties under that act. ROA.953-58 (discussing *Scindia Steam Navigation Co. Ltd. v. De Los Santos*, 451 U.S. 156 (1981)). Transocean also argued that the Longshore Act barred Santee's unseaworthiness claim. ROA.958-59.

Before contesting Chevron and Transocean's motions on the merits, Santee moved to compel discovery so that he could obtain crucial information for his defense against their motions. ROA.1292. But the district court summarily denied Santee's request. ROA.1528.

Santee then responded to Chevron and Transocean's motions (ROA.1724, 2033), while simultaneously moving for a continuance to again obtain essential discovery. ROA.1529. The court again summarily denied Santee's request. ROA.2349. It then granted Chevron and Transocean's motions, concluding that neither breached any duty to Santee and that

Santee's unseaworthiness claims against both failed as a matter of law. ROA.2377.

This timely appeal followed. ROA.2398.

## Summary of the Argument

**I.**     The district court reversibly erred in denying Santee's motion to remand, in which it concluded that (1) Santee fraudulently pleaded his Jones Act claims and (2) this case arises under OCSLA jurisdiction.

To begin, the court abused its discretion by considering Defendants' fraudulent-pleading ground for removal. By statute, a notice of removal must contain a "short and plain statement of the grounds for removal." A party meets that requirement by identifying the ground or, at bare minimum, by citing a case addressing that ground. Here, Santee expressly invoked the Jones Act in filing his claims in state court, stating the black-letter law that "*this Jones Act case is not removable*." Yet Defendants' notice of removal nowhere mentioned fraudulent pleading under the Jones Act as a ground for removal, instead raising the issue for the first time in their response to Santee's remand motion. As courts have held in comparable cases, that fails to meet the statutory requirement, thus forfeiting the issue.

Forfeiture aside, the district court misunderstood—and then misapplied—the fraudulent-pleading standard of review. When a defendant alleges that a claim was fraudulently pleaded, the court must evaluate the then-existing evidence under a uniquely heavy burden for a defendant. The

court may deny remand only where, after resolving all disputed facts and all ambiguities of law in plaintiff's favor, the plaintiff has *no possibility* of establishing his claim on the merits.

The court misapplied that standard in rejecting Santee's Jones Act claim. Contrary to its conclusion, Santee easily satisfies the two-part test for seaman status: as the court conceded, he directly contributed to the function of the *Deepwater Conqueror* by installing, operating, and maintaining the ROV system. And he demonstrated a connection to the vessel that is substantial in both its *duration* and *nature*. To that end, the court agreed that Santee met the "duration" and "sea-based work" criteria by working almost exclusively on the vessel—at sea, for nearly five years—until his injury.

Yet the court concluded that Santee failed the "allegiance" criteria because he had not provided "proof showing that he was *employed by* the owner or operator" of the vessel. But this Court has rejected such a requirement. And as courts have held since this Court's en banc opinion in *Sanchez*, a seaman may demonstrate allegiance to *both* the vessel *and* a shoreside employer. Santee's allegiance to the *Deepsea Conqueror* is clear: he ate and slept on the vessel in 21-day hitches over five years, operating the

ROV systems of critical importance to the vessel's drilling mission, while following orders from the vessel's captain and being integrated with its crew.

Last, the court erred in concluding that Santee failed the "assignment" principle: far from transitory or sporadic, Santee's indefinite assignment to the *Deepwater Conqueror* was precisely the kind of regular and continuous work this Circuit's cases require. Especially considering the fraudulent-pleading standard and the incomplete discovery, denying Santee's motion to remand was improper.

Even were this Court to (improperly) conclude that Santee is not a Jones Act seaman, no removal jurisdiction exists under OCSLA. Because OSCLA expressly excludes "vessels" from eligibility, OCSLA's situs requirement is not met. What is more, the district court erred by first ignoring the rule requiring evaluation of jurisdictional facts at the time of removal; failing to resolve any doubts concerning removal in favor of remand; and then denying Santee discovery by which to disprove Defendants' conclusory claim that the *Deepwater Conqueror* was attached to the seabed.

The district court thus erred in granting remand. As a result, its subsequent orders granting the Defendants' motions to dismiss must be vacated for lack for jurisdiction.

**II.**     The district court likewise erred in granting Oceaneering's motion for summary judgment. That ruling rests on the same unfounded premise that Santee is not a Jones Act seaman, thus immunizing Oceaneering from liability under the Longshore Act because it provides workers' compensation. As Santee is a seaman—or, at minimum, fact issues exist—the sole premise of the court's ruling fails.

**III.**     The district court's grant of summary judgment to Transocean was also improper, as the record demonstrates the court's disregard of key evidence demonstrating Transocean's breach of its *Scindia* duties. Through its daily meetings with Oceaneering, safety-management program, and risk-assessment requirements for "every job" (to name a few activities), Transocean demonstrated active control and actual knowledge of the very cursor-pin-changeout procedure that injured Santee. Transocean also breached its turnover duty by transferring to Santee the unsafe deck causing his injury, which was part of *Transocean*'s vessel.

The court likewise improperly granted summary judgment on Santee's unseaworthiness claim, given that he was injured while doing the work traditionally performed by seamen. Alternatively, it improperly denied Santee's motion for continuance to obtain necessary discovery to oppose

Transocean's summary-judgment motion, given the liberal standard for granting such requests.

IV.     The district court's grant of summary judgment to Chevron was equally improper. As demonstrated by Chevron's contracts, service order, mandatory safety guidelines, monitoring requirements, and reserved right to permanently retain Oceaneering's technicians, Chevron authorized or controlled Oceaneering's negligent cursor pin-changeout work, both contractually and through its conduct.

The court also improperly granted summary judgment on Santee's unseaworthiness claim, considering that Chevron exerted control over the vessel and (contractually) provided its crew and maintenance, constructively possessing the vessel. Alternatively, as with Oceaneering, the court abused its discretion in denying Santee's request for essential pre-summary-judgment discovery.

**ARGUMENT**

## I. The district court wrongly denied Santee's motion to remand.

Reviewed de novo, the district court reversibly erred in denying Santee's motion to remand. *Sanchez v. Smart Fabricators of Texas, L.L.C.*, 997 F.3d 564, 568 (5th Cir. 2021) (en banc). *First*, Defendants forfeited their fraudulent-pleading argument, thus requiring remand under the Jones Act. *Second*, even if not forfeited, the court misapplied the fraudulent-pleading standard to conclude that Santee had no reasonable possibility of establishing his seaman status. And *third*, regardless of the Jones Act, OCSLA jurisdiction does not exist.

### A. Claims filed in state court under the Jones Act, like Santee's here, are nonremovable.

As pleaded, Santee's three claims (negligence, unseaworthiness, and failure to pay maintenance and cure) all arise "under the Jones Act and general maritime law." ROA.17, 19-22. They are thus nonremovable.

The Jones Act grants various causes of action to "*[a] seaman* injured in the course of employment[.]"46 U.S.C. § 30104 (emphasis added). But the rights of land-based maritime workers—*i.e.*, maritime workers who are not Jones Act seamen—are "provided exclusively by" the Longshore and Harbor Workers' Compensation Act (Longshore Act). *Sanchez*, 997 F.3d at 569.

Because the Jones Act and Longshore Act "are mutually exclusive compensation regimes[,]" a plaintiff who "satisfies the criteria for being a seaman . . . is covered by the Jones Act and not the [Longshore Act.]" *Becker v. Tidewater, Inc.*, 335 F.3d 376, 386 (5th Cir. 2003).

As a seaman, Santee may sue three types of entities. *First*, he may sue Oceaneering (his Jones Act employer) for negligence, and may recover compensatory (but not punitive) damages under the Jones Act's "featherweight" standard. *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 327 (5th Cir. 2020) (emphasis added) (citation and quotation marks omitted). He may also sue Oceaneering for unreasonably rejecting its "absolute, non-delegable duty" to pay maintenance and cure. *In re 4-K Marine, L.L.C.*, 914 F.3d 934, 938 (5th Cir. 2019).

*Second*, "[a] Jones Act seaman may also sue the owner of any vessel on which he is working for a breach of the warranty of seaworthiness, regardless of whether the vessel is owned by his employer." *Becker*, 335 F.3d at 387. *Third*, "a Jones Act seaman may also sue third parties for general maritime law negligence." *Id.*

As particularly relevant here, "Jones Act claims are 'not subject to removal to federal court.'" *Sanchez*, 997 F.3d at 568 (quoting *Lewis v. Lewis*

& *Clark Marine, Inc.*, 531 U.S. 438, 455 (2001)). That black-letter law is "axiomatic." *Lackey v. Atlantic Richfield Co.*, 990 F.2d 202, 207 (5th Cir. 1993). This bar applies even when complete diversity exists, and regardless of any claims under OCSLA. *Lewis*, 531 U.S. at 455; *see also, e.g.*, *Rybolt v. Laborde Marine Lift*, No. 00-CV-3800, 2001 WL 263119 (E.D. La. Mar. 14, 2001).

But if Santee is not a Jones Act seaman, "he is protected only by the [Longshore Act]." *Becker*, 335 F.3d at 386. Because a Longshore Act employer is immune from tort liability, the worker's exclusive remedy against his employer is compensation benefits. 33 U.S.C. §§ 904, 905(a). The worker's remedies against a vessel owner may be limited to "a restrictive theory of negligence against a vessel as a third party to recover damages for injuries caused by vessel negligence[,]" *Becker*, 335 F.3d at 386, though he may recover for unseaworthiness if he was injured "doing traditional work of a seaman[.]" *Burks v. Am. River Transp. Co.*, 679 F.2d 69, 71 n. 1 (5th Cir. 1982), *abrogated on other grounds by Lozman v. City of Riviera Beach, Fla.*, 568 U.S. 115 (2013) (citing *Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946)). Finally, a Longshore Act Worker "may also sue nonvessel third parties under general maritime law tort principles." *Id.*

## B. Defendants forfeited their fraudulent-pleading ground by failing to mention it anywhere in their notice of removal.

The most straightforward reason to reverse is one that the district court never considered: Defendants never raised fraudulent pleading under the Jones Act as a ground for removal in their notice, thus forfeiting it. *Compare* ROA.379 (so arguing), *with* ROA.416-27 (never addressing argument).

A notice of removal must "contain[ ] a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). Although "detailed grounds setting forth basis for removal [are] not necessary," the notice "must adequately inform the plaintiff of the grounds[.]" *Ticer v. Imperium Ins. Co.*, 20 F.4th 1040, 1045-46 (5th Cir. 2021) (citation and quotation marks omitted). Thus when a defendant identifies a ground for removal by name, such as "improper joinder"—or even cites a case addressing that ground—the notice is "sufficient," and a district court may properly consider the ground. *Id.* at 1046.

But removal may not "be sustained on grounds not stated in the notice of removal." *Wessel v. Miraglia*, No. 4:04-CV-377-A, 2004 WL 1943776, at *3 (N.D. Tex. Aug. 31, 2004); *see also Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 296 n.2 (5th Cir. 2019) (citing *Wessel*). After all, "[i]t would be a substantial injustice to allow Defendants to remove a case on one ground" and then

"attempt to justify removal on an entirely different, and untimely, ground." *Wessel*, 2004 WL 1943776, at *3 (citation and quotation marks omitted).

But the district court wrongly permitted such an improper maneuver here. In their notice of removal, Defendants identified three—and only three—jurisdictional grounds for removal: OSCLA, federal question, and admiralty. ROA.10-12; *see also* ROA.39, 41. Santee's state-court petition, however, asserted claims under the "not removable" Jones Act. ROA.17 (citing *Lackey*, 990 F.2d at 207).

Defendants' notice nowhere addressed fraudulent pleading under the Jones Act (or even a case addressing fraudulent pleading) as a ground for removal. Instead, they raised the ground for the first time in their responses to Santee's motion to remand. *See* ROA.220. As several district courts have held under similar facts, Defendants thereby forfeited the argument. *E.g.*, *Nexbank, SSB v. BAC Home Loan Servicing, LP*, No. 3:11-CV-00279-L, 2011 WL 5182118, at *6 (N.D. Tex. Oct. 28, 2011); *Wessel*, 2004 WL 1943776, at *3; *Pacheco v. Am. Smelting & Ref. Co., Inc.*, 2005 WL 1404152, at *3 (W.D. Tex. June 1, 2005); *see also generally Ticer*, 20 F.4th at 1046; *Hoyt*, 927 F.3d at 296 n.2.

This Court need go no further. Because it is undisputed that Jones Act claims are nonremovable and Defendants never raised fraudulent pleading under the Jones Act as a ground for removal, the district court was required to remand.

**C.    Regardless, the district court misapplied the fraudulent-pleading standard to conclude that there is no possibility that Santee could prove his seaman status.**

Even assuming Defendants had not forfeited their fraudulent-pleading argument, the district court wrongly accepted it. Defendants hardly met their heavy burden to establish that Santee fraudulently pleaded his Jones Act claims. If anything, the current record conclusively supports that Santee is a Jones Act seaman.

**1.    A court may grant remand only when there is no possibility that a plaintiff might in the future (including with the benefit of discovery) prove he is a seaman.**

A defendant who seeks to pierce the pleadings based on fraudulent joinder bears a heavier burden than at summary judgment. *Lackey*, 990 F.2d at 207. Evaluating the validity of a Jones Act claim at the remand stage "is usually limited to a review of the plaintiff's pleadings." *Id.* What is more, the "determination of whether an injured worker is a seaman under the Jones Act is a mixed question of law and fact and it is usually inappropriate to take the question from the jury[.]" *Becker*, 335 F.3d at 386.

A court may deny remand "only where, resolving all disputed facts and ambiguities in current substantive law in plaintiff's favor, the court determines that the plaintiff has *no possibility* of establishing a Jones Act claim on the merits." *Holmes*, 437 F.3d at 445 (citation and quotation marks omitted) (emphasis added). Put another way, the defendant must show "that there is *no reasonable basis* for the district court to predict that the plaintiff *might* be able to recover" on the merits. *Davidson v. Georgia-Pac., L.L.C.*, 819 F.3d 758, 765 (5th Cir. 2016) (emphases added).

Thus, as a predictive standard, "the question is what the plaintiff might prove *in the future*." *Hoyt*, 927 F.3d at 293 (5th Cir. 2019) (emphasis in original). The court "must take into account the status of discovery and consider what opportunity the plaintiff has had to develop its claims[.]" *Davidson*, 819 F.3d at 765 (citation and quotation marks omitted). If there is even "*arguably* a reasonable basis for predicting" recovery on the merits, then there is no fraudulent pleading. *Travis v. Irby*, 326 F.3d 644, 648 (5th Cir. 2003) (emphasis added).

> ## 2. A Jones Act seaman must have a substantial connection to a vessel and contribute to its functions.

The essential requirements for seaman status fall under two general criteria. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995). Under the first

criterion, the worker's duties "must contribute to the function of the vessel or to the accomplishment of its mission[.]" *Id.* at 376. "[T]his threshold requirement is very broad: All who work at sea in the service of a ship are eligible for seaman status." *Id.* at 368 (citation, quotation marks, and emphasis omitted).

Under the second criterion, a seaman must "have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its [1] duration and [2] its nature." *Id.* The substantiality requirement seeks to "separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Id.* (citation omitted).

A worker satisfies the "duration" prong when, as a "rule of thumb," he spends at least 30 percent of his "total employment time" in the service of a vessel. *Sanchez*, 997 F.3d at 574. This analysis considers "the total circumstances of an individual's employment[.]" *Chandris*, 515 U.S. at 370.

The following "[p]rinciples" from *Sanchez* show how a worker meets the "nature" prong. 997 F.3d at 774. *First*, a seaman must "owe his allegiance

to the vessel, rather than simply to a shoreside employer[.]" *Id.* But as this Court has held, "[a] seaman's Jones Act employer *need not be the owner of the vessel*[.]" *Wallace v. Oceaneering Int'l*, 727 F.2d 427, 433 (5th Cir. 1984) (emphasis added). Rather, as two district courts and Professor Galligan have agreed after *Sanchez*: "[A]llegiance can be divided, and that is not fatal to a finding that the worker's connection to the vessel is substantial in nature." Thomas C. Galligan, Jr., *The "Nature" of Seaman Status After* Sanchez, 82 La. L. Rev. 1, 29 (2021) ("GALLIGAN"); *accord Barlow v. BP Expl. & Prod., Inc.*, 620 F. Supp. 3d 475, 479 (E.D. La. 2022) (Fallon, J.); *Victoria Sanchez v. Am. Pollution Control Corp.*, 542 F. Supp. 3d 446, 457 (E.D. La. 2021) (Barbier, J.) ("*Victoria Sanchez*")).

*Second*, the worker's work must be "sea-based or involve seagoing activity" that subjects him to the "perils of the sea." *Sanchez*, 997 F.3d at 574. Although the work need not "aid in navigation or contribute the transportation of the vessel," the seaman "must be doing the ship's work." *McDermott Intern., Inc. v. Wilander*, 498 U.S. 337, 355 (1991).

*Third*, the worker's assignment to a vessel cannot be "limited to performance of a discrete task after which the worker's connection to the

vessel ends[.]" *Sanchez*, 997 F.3d at 574. Rather, it may "include sailing with the vessel from port to port or location to location[.]" *Id.*

This inquiry does not focus on "an examination of the overall course of a worker's service with a particular employer[.]" *Id.* at 371-72. It instead considers a worker's specific "assignment," which must demonstrate "a regular and continuous, rather than intermittent, commitment of the worker's labor to the function of a vessel." *Chandris*, 515 U.S. at 372. So when a worker does not frequently return to his home on land, lives on the vessel for weeks at a time, and travels with the vessel, the assignment principle is satisfied. *See Barlow*, 620 F. Supp. 3d at 480; *Victoria Sanchez*, 542 F. Supp. 3d at 456.

By contrast, the "assignment" principle eliminates workers with "only a transitory or sporadic connection to a vessel[.]" *Sanchez*, 997 F.3d at 572 (quotation marks omitted). For example, "[d]iscrete transient jobs are like the work done by longshoremen when a vessel calls in port[,]" such as maintenance work. *Id.* at 576; *see also id.* at 572.

As Professor Galligan has correctly explained, the "allegiance" and "assignment" inquiries "overlap with the durational requirement." Galligan at 37. "[T]ime on an assignment or with a vessel is the most objective way to

decide if an assignment is discrete and transient or ongoing." *Id.*; *see also Barlow*, 620 F. Supp. 3d at 480.

> ### 3. Santee is a "seaman" because of his five-year deployed, sea-based work on the *Deepwater Conqueror*.

Under the *Sanchez* elements, Santee is a Jones Act seaman.[3] At minimum, Defendants failed to meet their heavy burden to establish that there was no reasonable basis to conclude that he could establish his seaman status. *See Davidson*, 819 F.3d at 765.

Start with what is not in dispute. As the district court properly conceded, Santee easily satisfied several elements:

- The "contribution to the mission" element, considering Santee's ROV work contributed to the *Deepwater Conqueror*'s sea-based drilling mission. ROA.418-19.

- The "duration" prong of the "substantial connection" test, given Santee's five years of employment time aboard the vessel. ROA.419-21.

- The substantial-nature test's "sea-based activity" principle, given that "ROVs are subsea vehicles which must be at sea to operate." ROA.424.

---

[3] It is unclear whether *Sanchez* "set forth mandatory elements—meaning that all must be satisfied in order for the connection to be substantial in nature—or if [the court] intended that they be treated as indicia or factors to be weighed." *Victoria Sanchez*, 542 F. Supp. 3d at 457; *see also* GALLIGAN at 35. It is Santee's position that they are merely factors to be weighed, rather than a list of required elements. But even assuming the latter, Santee meets all of the elements, as explained below.

Nonetheless, despite Santee's virtually exclusive commitment to the *Deepwater Conqueror* over a five-year period, the court concluded that he failed the "allegiance" and "assignment" principles. ROA.422-27. Putting aside the court's failure to properly apply the fraudulent-pleading standard, it reached that conclusion only by erroneously erecting heightened requirements that Santee (1) demonstrate allegiance by being "employed by" the vessel owner, and (2) establish assignment by demonstrating that his assignment to the vessel was formally "permanent." ROA.423, 426.

To begin, the court's analysis ignores how the "duration" prong overlaps with—and informs—the "allegiance" and "assignment" principles. *See* GALLIGAN at 37; *Barlow*, 620 F. Supp. 3d at 480; *Victoria Sanchez*, 542 F. Supp. 3d at 456. The court concluded that Santee "spent at least approximately 40% of his time" in the five years before his injury—763 days out of "1,858 [calendar] days"—on the vessel. ROA.421 n.6. But under *Sanchez*, total calendar days is the incorrect denominator. It is instead "total *employment* time." 997 F.3d at 574 (emphasis added). Under the proper denominator, Santee's employment time on the *Deepwater Conqueror exceeded 96 percent*. *See* ROA.245-48, 296-313, 506.

Put simply, nearly 100 percent of Santee's employment during this five-year period was spent in service to the *Deepwater Conqueror*. *See Chandris*, 515 U.S. at 372 (explaining that an "assignment" must demonstrate "a regular and continuous, rather than intermittent, commitment of the worker's labor to the function of a vessel"). Over five years of continuous work, Santee abundantly demonstrated his allegiance and assignment to the *Deepwater Conqueror* in a myriad of ways. He installed, operated, and maintained the ROV system on the *Deepwater Conqueror*, which directly supported the vessel's sole mission of "sea-based drilling." ROA.505-06. He took orders from the vessel's captain, reported to an onboard company man, and integrated with the vessel's crew and chain of command. ROA.506. He ate, slept, and carried out all other life activities aboard the vessel—typically for 21 days at a time, but up to 52 continuous days on the vessel. *See* ROA.246, 506. And he sailed with the vessel as it went to drill a new well. *See* ROA.243.

The court's rationale for finding the "allegiance" principle not met was its demand for "proof showing that [Santee] was *employed by* the owner or operator of the *Deepwater Conqueror*[.]" ROA.423 (emphasis added). But this Court has rejected such a formalistic requirement, holding that "[a] seaman's Jones Act employer need not be the owner of the vessel[.]" *Wallace*, 727 F.2d

at 433 (emphasis added). Instead, a worker must show that he "owe[s] his allegiance to the vessel," rather than "solely" or "simply" to a shoreside employer. *Sanchez*, 997 F.3d at 774. This evidence demonstrates Santee's equal—if not *greater*—"allegiance" to the *Deepwater Conqueror* as to Oceaneering, thus establishing a "dual allegiance" scenario. *Barlow*, 620 F. Supp. at 479; *Victoria Sanchez*, 542 F. Supp. 3d at 457; *see also* GALLIGAN at 37.I

As to the "assignment" principle, the court wrongly demanded evidence that Santee was "*permanently assigned* to the *Deepwater Conqueror*[.]" ROA.426 (emphasis added). But such evidence was unnecessary. The "assignment" principle serves to exclude workers who "have only a 'transitory or sporadic' connection to a vessel"—in short, "[d]iscrete transient jobs[.]" *Sanchez*, 997 F.3d at 572, 576.

A prime example of discrete, transitory, or sporadic work comes from *Sanchez*. There, the plaintiff (a welder) performed a "discrete, individual job" and then "ha[d] no further connection to the vessel." *Sanchez*, 997 F.3d at 576. Indeed, he simply "performed discrete repairs, and then returned to shore, leaving the rig to continue its mineral exploration mission on the outer continental shelf." *Victoria Sanchez*, 524 F. Supp. 3d at 456.

Santee's work, by contrast, abundantly demonstrated the "regular and continuous, rather than intermittent, commitment of the worker's labor to the function of a vessel[.]" *Chandris*, 515 U.S. at 372. Over five years, Santee continuously and directly supported the *Deepwater Conqueror*'s sole function—sea-based drilling—by operating and maintaining the ROVs and the broader ROV system over five years. He was essential to the *Deepwater Conqueror*'s mineral exploration mission. ROA.505-06. And his assignment to the vessel was "of an indefinite duration" and "had no known end date" (ROA.506)—the very definition of "permanent." ROA.426; *see also Barlow*, 620 F. Supp. 3d at 480 ( "assignment" met when worker directly assisted with vessel's core mission of "collecting oiled boom and bags"; did not return to his land-based home daily after work; lived on the vessel "for hitches up to 24 days"; and traveled with the vessel to different locations); *Victoria Sanchez*, 542 F. Supp. 3d at 456 ( "assignment" met when worker's "mission and the vessel's mission were the same: deploy and retrieve boom"; and when "but for her injury, [the worker] would have continued working on the [vessel] until its tour" ended).

Though no more is necessary, Oceaneering admitted that Santee is a seaman by its conduct. Only Jones Act seamen "are entitled to the benefits of

maintenance and cure." *Hall v. Diamond M Co.*, 732 F.2d 1246, 1248 (5th Cir. 1984). Yet if Santee was not a seaman, why did Oceaneering pay him maintenance-and-cure benefits for eight months in 2021? *See* ROA.507-13. That is further "evidence of seaman status." *Fields v. Pool Offshore, Inc.*, 182 F.3d 353, 359 (5th Cir. 1999).

Accordingly, even if Santee was required to prove his seaman status at the motion-to-remand stage, he did so here. The district court's contrary conclusion rests instead on its misapplication of the facts and law.

### 4. Especially under the fraudulent-pleading standard, denying Santee's motion to remand was improper.

What is more, the district court's refusal to remand ignores Defendants' "heavy" burden to demonstrate fraudulent pleading. *Burchett v. Cargill*, 48 F.3d 173, 176 (5th Cir. 1995). Santee was not required to conclusively prove his seaman status at this stage (even though he did). Instead, Defendants were required to show "that there is *no reasonable basis* for the district court to predict that the plaintiff *might* be able to recover" as a Jones Act seaman. *Davidson*, 819 F.3d at 765 (emphasis added). Given the above facts—and especially considering that "all disputed facts and ambiguities in current substantive law" must be resolved "in plaintiff's favor"—the court could hardly conclude that Santee had "*no possibility* of establishing a Jones Act

claim on the merits." *Holmes*, 437 F.3d at 445 (citation and quotation marks omitted) (emphasis added); *see also Perez v. Aquaterra Contracting, LLC*, 593 F. Supp. 3d 444, 450 (E.D. La. 2022) (remanding wrongful death case to state court where "underdeveloped record" indicated that "material facts remain in dispute as to decedent's Jones Act status at the time of his death" and thus the defendants had not "carried their heavy burden to show that plaintiff has 'no possibility' of recovery on her Jones Act claim").

Indeed, this conclusion is bolstered by the requirement that the court "take into account the status of discovery and consider what opportunity the plaintiff has had to develop its claims." *Davidson*, 819 F.3d at 765. Here as well, the court failed to do so, deciding the issue as a matter of law before any discovery could take place. Santee later identified several areas where discovery would be relevant to the "allegiance" and "assignment" principles, including (for example):

- Data from onboard recording devices that track the movement of the *Deepwater Conqueror* before and after the incident, which would further demonstrate Santee's travel aboard the vessel (ROA.1319);

- The deposition of Captain James Stewart, to further establish Santee's integration with the crew and his obedience to Captain Stewart's commands (ROA.1310); *and*

- The deposition of Dan Javonavic, Chevron's drilling superintendent, who would "be able to testify about operations of the vessel, work ongoing at the time, and the relationship between parties" (ROA.1310).

In sum, because Defendants failed to meet their burden to show that Santee has no possibility of recovery as a Jones Act seaman, the district court erred in denying Santee's motion to remand. As a result, all of Santee's claims must be remanded to state court. *See Becker*, 335 F.3d at 386-87; *Perez*, 593 F. Supp. 3d at 450.

### D. OCSLA provides no basis for removal because Santee was not injured on an Outer Continental Shelf situs.

Even were this Court to (incorrectly) conclude that Santee is not a Jones Act seaman, no federal jurisdiction exists under OCSLA.

OCSLA "asserts exclusive federal question jurisdiction" over the Outer Continental Shelf by extending federal law to "all installations and other devices permanently or temporarily attached to the seabed . . . for the purpose of exploring for, developing, or producing resources[.]" *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 213 (5th Cir. 2013) (citing 43 U.S.C. §§ 1333(a)(1), 1349(b)(1)). To determine "whether a cause of action arises under OCSLA," this Court applies "a but-for test" that considers whether: "(1) the facts underlying the complaint occurred On the proper situs; (2) the

plaintiff's employment furthered mineral development on the OCS; and (3) the plaintiff's injury would not have occurred but for his employment." *Id.*

Under Section 1333(a)(1), OCSLA jurisdiction applies to the following situses:

> (i) the subsoil and seabed of the outer Continental Shelf;
>
> (ii) all artificial islands on the outer Continental Shelf;
>
> (iii) installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources, including non-mineral energy resources; or
>
> (iv) any such installation or other device (*other than a ship or vessel*) for the purpose of transporting or transmitting such resources.

43 U.S.C. § 1333(a)(1)(A) (emphasis added); *see also Barker*, 713 F.3d at 213 (using same section to define an OCSLA situs). OCSLA thus extends to "devices" "attached to the seabed" like jack-up drilling platforms, whose legs extend downward through the water into the seabed as a means of support. *Barker*, 713 F.3d at 211, 213.

Judge Costa's opinion in *Boutte* highlights the importance of OCSLA's situs requirement. *Boutte v. Yamaha Motor Corp., U.S.A.*, No. 3:13-CV-166, 2013 WL 3816585 (S.D. Tex. July 22, 2013). There, the plaintiff was injured aboard a vessel that was delivering laborers and supplies to the Deepwater

Horizon oil rig as part of the disaster-relief efforts. *Id.* at *1. In granting remand, Judge Costa rejected the argument that OCSLA jurisdiction existed because the injury "would not have occurred 'but for' the explosion on the Deepwater Horizon oil rig[,]" which was an OCS situs. *Id.* at *3. As he explained, "Accidents that occur on navigable waters, even those over the OCS itself, do not"—without more—"occur on an OCS situs." *Id.* at *2 (citing *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 218 (1986)). Thus it matters not that Santee's injury occurred "over the OCS itself[.]" *Id.*

In fact, what is critical here is the location of Santee's injury: while aboard the *Deepwater Conqueror*. Yet OCSLA expressly excludes from its scope "ship[s] [and] vessel[s]" by specifying that vessels are not "installations" or "devices." 43 U.S.C. § 1333(a)(1)(A)(iii)-(iv). Ignoring this statutory bar, the district court relied on conclusory declarations from Transocean and Chevron employees averring that when Santee was injured, the *Deepwater Conqueror* "was attached to the seabed" in the Jack/St. Malo Field, some 280 miles south of New Orleans. ROA.428 (citing ROA.339, 358).

In reaching that conclusion, the district court committed two errors. For starters, it improperly overlooked the "well entrenched" rule that "jurisdictional facts are assessed *at the time of removal*[.]" *Louisiana v. Am.*

*Nat. Prop. Cas. Co.*, 746 F.3d 633, 639 (5th Cir. 2014) (citation and quotation marks omitted) (emphasis added). When the case was removed, there was no allegation that the *Deepwater Conqueror* was attached to the seabed. *See* ROA.10-13.

More important, the court failed to resolve any doubts concerning removal in favor of remand. *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339 (5th Cir. 2000). Indeed, federal courts "must presume that a suit lies outside [its] limited jurisdiction" unless a defendant meets its burden to prove otherwise by a preponderance of evidence. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). To that end, the court wrongly rebuffed Santee's effort to compel necessary discovery of data from onboard recording devices tracking the movement of the *Deepwater Horizon* both before and after the incident. ROA.1319. That data bears directly upon the OCSLA analysis: it would test Defendants' conclusory assertions that the *Deepwater Conqueror* was attached to the seabed on the date of his injury. *See Belliveau v. Barco, Inc.*, 987 F.3d 122, 134 (5th Cir. 2021) (conclusory affidavits are insufficient to establish facts). Since the situs element is missing—or, at minimum, fact issues exist on that element—OCSLA jurisdiction does not exist.

Because no basis for federal jurisdiction exists, the district court reversibly erred in denying Santee's motion to remand.[4] This error not only requires reversal, but vacatur of the court's later orders granting Defendants' motions for summary judgment for lack of jurisdiction. *E.g.*, *Camsoft Data Sys., Inc. v. S. Elecs. Supply, Inc.*, 756 F.3d 327, 340 (5th Cir. 2014).

## II. The district court erred in granting Oceaneering's motion for summary judgment, which rested solely on its erroneous Jones Act conclusion.

The district court also erred in granting summary judgment to Oceaneering—a decision this Court reviews de novo. *Wells v. Minnesota Life Ins. Co.*, 885 F.3d 885, 889 (5th Cir. 2018). Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding motions for summary judgment, courts "may not

---

[4] Though Defendants also initially cited admiralty jurisdiction under 28 U.S.C. § 1333 as a standalone ground for removal (ROA.12), they abandoned that position in their surreply. ROA.400. That is for good reason. The "famous" Saving to Suitors Clause "preserved" the historic "role of the States in the administration of maritime law." *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 362 (1959). Under this clause, general maritime claims brought in state court are not by themselves removable. *E.g.*, *id.* at 377-79. Instead, removal is appropriate only when "federal jurisdiction exists under a *separate* statute"—for example, OCSLA. *Morris v. T E Marine Corp.*, 344 F.3d 439, 444 (5th Cir. 2003) (emphasis added).

make credibility determinations or weigh the evidence" when contradictory facts exist. *Wells*, 885 F.3d at 889 (quotation marks omitted).[5]

The district court granted Oceaneering's motion for summary judgment on one ground: "Santee's exclusive remedy lies under the LHWCA, not the Jones Act." ROA.551. Accordingly, because Oceaneering had procured Longshore Act-compliant workers' compensation coverage as of the day of Santee's injury, the court held it was immune from liability under the Longshore Act. ROA.551; *see* 33 U.S.C. § 905(a); *Raicevic v. Fieldwood Energy, L.L.C.*, 979 F.3d 1027, 1035 (5th Cir. 2020). Ignoring Santee's affidavit (ROA.470-72), his request for reconsideration (ROA.448-68, ROA.485-503), and his renewed argument that he is a seaman under the Jones Act when responding to Oceaneering's summary-judgment motion (ROA.490-503), the district summarily concluded that "Santee's seaman status is no longer at issue." ROA.551.

But as demonstrated earlier, the district court's conclusion is incorrect. At minimum, numerous fact issues exist as to whether Santee was a Jones Act seaman—including as to his allegiance to the *Deepwater Conqueror* and his

---

[5]     The same standard of review applies to Santee's challenges to the district court's summary-judgment grants to Transocean and Chevron. *See infra* Parts III-IV.

indefinite assignment there. *See supra* Part I.C. The court thus wrongly granted summary judgment to Oceaneering on the erroneous application of the Longshore Act.

## III. The district court erred in granting summary judgment for Transocean, which breached its *Scindia* duties.

In concluding that Transocean breached none of its *Scindia* duties and could not be liable for unseaworthiness, the district court improperly granted Transocean's motion for summary judgment.

Under the Longshore Act, a covered maritime worker "'may pursue a tort action against the owner of a vessel for acts of vessel negligence.'" *Payano v. Envtl. Safety & Health Consulting Servs., Inc.*, 778 F. App'x 313, 314 (5th Cir. 2019) (per curiam) (quoting *Levene v. Pintail Enters.*, 943 F.2d 528, 531 (5th Cir. 1991)). The "action may also be brought against the vessel's 'owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member.'" *Id.* (quoting 33 U.S.C. § 902(21)). It is undisputed that Transocean falls within this definition. ROA.954.

A vessel owner owes three duties under the Longshore Act's "vessel negligence" provision. *Manson Gulf, L.L.C v. Modern Am. Recycling Serv., Inc.*, 878 F.3d 130, 134 (5th Cir. 2017). These duties are commonly known as a

vessel owner's *Scindia* duties. *Id.* (citing *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 164 (1981)).

*First*, a vessel owner owes a *turnover duty*, which entails two "distinct-but-related obligations." *Id.* Under the first obligation, the owner must "exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that" a worker can carry on its "operations with reasonable safety[.]" *Id.* Under the second obligation, the owner must "warn the [maritime employee] of latent or hidden dangers which are known to the vessel owner or should have been known to it." *Id.* (citation and quotation marks omitted).

*Second*, an owner owes an *active-control duty—i.e.*, to exercise reasonable care to avoid exposing workers to hazards in those areas under the vessel's active control. *Id.* When the owner oversees and directs "operative details" of the maritime employee's work or makes "decisions affecting the safety of [the maritime employee's] work area[,]" it exercises the requisite active control. *Romero v. Cajun Stabilizing Boats Inc.*, 307 F. App'x 849, 851 (5th Cir. 2009) (per curiam). The active-control duty applies even "when the hazard is open and obvious[.]" *Pimental v. LTD Canadian Pac. Bui*, 965 F.2d 13, 16 (5th Cir. 1992). Only when the owner has fully "relinquished control

over an area" to the maritime employee does the responsibility to "remedy a hazard in that area" shift to the employee. *Id.*

*Third*, an owner owes a *duty to intervene* in the worker's operations. This duty applies when the owner has actual knowledge of the hazard that the worker will encounter, and the worker's intent to "work on" through the hazard in the exercise of "obviously improvident judgment[.]" *Id.* (citation and quotation marks omitted).

### A. Transocean owed and breached its active-control duty and its duty to intervene.

Contrary to the district court's opinion, genuine issues of material fact exist as to whether Transocean breached its active-control duty.

The court's conclusion rests on disregarding substantial evidence favorable to Santee. For starters, it ignored that Transocean and its affiliates owned, operated, managed, and otherwise controlled the *Deepwater Conqueror*'s day-to-day operations. As Transocean's corporate representative acknowledged, it was "[Transocean's] responsibility both offshore and onshore to operate the *Deepwater Conqueror* in a safe and responsible manner." ROA.2165. In the view of Chevron's corporate representative, Transocean's captain was "in charge" of the vessel and assumed "responsib[ility] for folks on th[e] drill ship." ROA.2100. Transocean's

representative agreed that its captain had "ultimate authority over everybody on the vessel when it comes to executing safe work." ROA.2172.[6] The evidence thus showed that Transocean was responsible for ensuring "there's no dangerous equipment on board that could hurt the crew" and for "correct[ing]" any unsafe condition on the vessel. ROA.2122; *see also* ROA.2080-81, 2076, 2121, 2161, 2175.

Transocean also exercised detailed control over the work of the *Deepwater Conqueror*'s crew and third-party contractors. For example, during onboarding training, Transocean educated workers on its safety rules for the rigs, set expectations, and instructed workers on use of prompt cards. ROA.2167-69. It required everyone on the vessel to utilize its prompt card to conduct risk assessments for "[e]very job[.]" ROA.2168, 2181. Transocean also imposed a Safety and Environmental Management (SEMS) program—a management system "maintained by Transocean" for "the safety of all personnel onboard the *Deepwater Conqueror*." ROA.2183-84. The SEMS program applied to Oceaneering, enforced "safe work practices," mandated job-safety analyses, required "adherence to follow Transocean's policies and

---

[6]     Indeed, following Santee's injury, Transocean's captain ordered him to stay in his quarters, not permitting him to exit to attempt further work or even to complete the incident paperwork. ROA.2219.

procedure[,]" and required Oceaneering's workers to report to Transocean authorities. ROA.2169, 2179, 2183. Then, in daily operations, Transocean's crew held 5:30 a.m. "pre-tour meetings" with all maritime workers. ROA.2182-83.[7]

And after Santee's injury, Transocean's communications demonstrated its awareness of and control over the cursor-changeout process itself. As Transocean's captain stated, "*We* need to develop a new method to insert / remove the cursor pin[.]" ROA.2194 (emphasis added). Following collaboration between Oceaneering and Transocean employees, the captain directly reviewed and required Oceaneering's compliance with the revised process. He said: "this process is much better than what *we* had[,]" ordering Oceaneering to use "the improved and required process" for "putting in the pin and taking it out." ROA.2196 (emphasis added).

The district court thus erred in concluding that Santee did not "produce evidence showing the ROV equipment and the Lars deck where Santee performed his work at the time of his injury was within Transocean's active control." ROA.2391. To the contrary, abundant record evidence—especially

---

[7]     As this evidence demonstrates, Transocean assumed a principal-agent relationship with Santee and thus may also be held liable under an operational-control theory. *See infra* at 61-62; ROA.2039-52.

when viewed in a light most favorable to Santee—demonstrates that Transocean—here as in *Romero*—oversaw and directed "operative details" of Santee's cursor roller-changeout work and "made decisions affecting the safety of [his] work area." 307 F. App'x at 851; *see, e.g.*, ROA.2167-69, 2179, 2181-84, 2194, 2196. And as in *Whelan v. American Roll-On Roll-Off Carrier LLC*, Transocean here was "actively involved in [ ] operations[,]" performed supervisory and inspection roles, and "communicate[d] [ ] about required changes or safety issues[,]" precluding summary judgment. No. CV-H-21-2750, 2022 WL 16722367, at *5-6 (S.D. Tex. Nov. 4, 2022). Accordingly, the active control of the vessel extended to the LARS deck and the hazardous changeout procedure, even though (as the district court observed) Santee and his co-ROV technicians carried out the procedure and Santee provided *some* supervision over it. ROA.2391. Indeed, the cursor's rollers required the help of Transocean's roustabouts to remove and replace, further demonstrating its active control over the area. ROA.2212. As a result, Transocean's duty was "not relieved" even if the condition and changeout procedure could be deemed open and obvious (and it cannot). *Pimental,* 965 F.2d at 16.

Transocean's daily directives, monitoring, and involvement in Oceaneering's ROV work also provide circumstantial evidence that

Transocean personnel actually knew of the improper procedure that Santee and other ROV technicians utilized to change out the cursor pin. *Contra* ROA.2392; *see, e.g.*, ROA.2169, 2179, 2182-83, 2321. But because Transocean did not intervene—even while aware of the hazards of the changeout procedures and equipment and the "improvident judgment" of the ROV technicians—Transocean breached its duty to intervene. *Manson Gulf,* 878 F.3d at 134. At minimum, genuine issues of material fact preclude summary judgment here.

Applying the proper summary-judgment standard—in which *all* of the evidence is considered (not just that favorable to Transocean, and in the light most favorable to Santee)—genuine issues of material fact exist as to Transocean's breach of its active-control duty and duty to intervene. The court reversibly erred in concluding otherwise.

## B. Transocean also breached its turnover duty.

The district court's conclusions as to Transocean's turnover duty was also incorrect.

In the court's view, summary judgment was proper because Santee "fail[ed] to show Transocean knew or should have known the Vessel's Lars deck" was not "large enough to accommodate Oceaneering's ROV

equipment." ROA.2389. But that spins facts and reasonable inferences in the light most favorable to *Transocean*, not Santee. Given Transocean's close monitoring of Oceaneering's ROV maintenance activities, a reasonable juror could conclude that Transocean *did* "kn[o]w or should have known the Vessel's Lars deck" was not "large enough to accommodate Oceaneering's ROV equipment." *Contra* ROA.2389. By permitting the ongoing and unreasonable cursor-pin changeout procedure, Transocean breached its duty to turn over the deck so that Santee could carry on his "operations with reasonable safety." *Manson Gulf,* 878 F.3d at 134.

To support its conclusion, the court also opined that "the ROV equipment Santee was using and performing maintenance on when he was allegedly injured was *owned by Oceaneering*." ROA.2389 (emphasis added). But it ignored that the LARS deck itself is a "deck on the vessel"—*i.e.*, simply "the deck below the ROV where the ROV is mounted[.]" ROA.1885. It never considered that the *deck* did not accommodate proper placement of the ladder when pinning the cursor. ROA.1885. Given that the deck *belongs to the vessel owner*—*i.e.*, Transocean—the dangerous equipment belonged to Transocean, not Oceaneering. *See* ROA.1885.

Because the district court never mentioned Santee's gross-negligence claim (*see* ROA.2387-93), its implicit grant of summary judgment on that claim necessarily rested on its conclusion as to negligence. *See* ROA.2394. But as shown, genuine issues of fact preclude its negligence conclusion, thus equally requiring reversal of its implied gross-negligence ruling.[8]

### C. Transocean is liable for unseaworthiness because Santee was performing a seaman's work.

The district court equally erred in granting summary judgment for Transocean on Santee's unseaworthiness claim. The record shows that Transocean's daily directives, monitoring, and involvement in Oceaneering's ROV work give rise to unseaworthiness liability.

"General maritime law imposes a duty upon shipowners to provide a seaworthy vessel[,]" which entails ensuring that the "vessel *and its appurtenances*" are "reasonably fit for their intended uses." *Luwisch*, 956 F.3d at 326 (citations and quotation marks omitted) (emphasis added).

---

[8]     Even on the merits, Transocean's knowing breach of its *Scindia* duties reflects the "willful, wanton and reckless conduct that falls between intent to do wrong and ordinary negligence[,]" thereby establishing gross negligence. *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531 (5th Cir. 2001) (Louisiana law); *accord Sebble on Behalf of Estate of Brown v. St. Luke's #2, LLC*, 358 So.3d 1030, 1040 (La. App. 4 Cir., 2023).

In the district court's view, the Longshore Act "barred as a matter law" Santee's unseaworthiness claim. ROA.2393 (citing 33 U.S.C. § 905(b)). But even assuming the district court's improper conclusion that Santee is not a Jones Act seaman (*see supra* Part I.C), the district court ignored that Santee may yet bring an unseaworthiness claim because he was injured "doing traditional work of a seaman[.]" *Burks*, 679 F.2d at 71 n. 1 (citing *Sieracki*, 328 U.S. 85). *See also Prestenbach v. Glob. Intern. Marine, Inc.*, 244 Fed. Appx. 557, 561 n.3 (5th Cir. 2007) (per curiam) (citing *Aparicio v. Swan Lake*, 643 F.2d 1109 (5th Cir. 1981) and *Kermarec v. Compagnie Générale Transatlantique*, 358 U.S. 625 (1959)). And ROV work is necessary for the regular operations of the *Deepwater Conqueror*. ROA.2152, 2230. Accordingly, Santee must only establish that "the unseaworthy condition played a substantial part in bringing about or actually causing [his] injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Rivera v. Kirby Offshore Marine, L.L.C.*, 983 F.3d 811, 818 (5th Cir. 2020) (citation and quotation marks omitted).

Santee has made that showing here. The record demonstrates that Transocean knew the importance of using proper step ladders and procedures for work at heights (ROA.2321); was contractually required to ensure that all

equipment on board was safe (ROA.1884); was aware of Santee's ROV maintenance work after the pre-tour meeting on the day of the incident (ROA.1810-11); and knew the risks and limitations of its equipment involved but failed to provide a seaworthy vessel (ROA.1778, 1886, 2194, 2196). Under this Court's precedents, the district court erred in concluding otherwise. *Cf. Rivera*, 983 F.3d at 818 (vessel was unseaworthy where plaintiff was injured by fall over unmarked hatch door and door was a tripping hazard).

## D. Alternatively, the district court abused its discretion in denying Santee's motion for continuance to obtain necessary discovery to oppose Transocean's motion.

Fact issues thus preclude summary judgment as to Transocean's motion, even on this underdeveloped record. Even so, the district court abused its discretion in denying Santee's motion to compel essential discovery and separate motion for a continuance of Transocean's motion until he could obtain that crucial discovery.

Under Rule 56(d), a plaintiff may show by declaration that he "cannot present facts essential to justify [his] opposition[,]" and the court may "allow time" to "take discovery[.]" Fed. R. Civ. P. 56(d). The party filing the motion must demonstrate "how additional discovery will create a genuine issue of

material fact." *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 445 (5th Cir. 2001). As this Court has held, "Rule 56(d) motions for additional discovery are broadly favored and should be liberally granted[.]" *Am. Family Life Assurance Co. v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013).

Santee made the requisite showing here. *See* ROA.1292-1526 (motion to compel and exhibits); ROA.1529-1723 (Rule 56(d) motion for continuance and exhibits). In targeted, specific requests, Santee sought a continuance to depose Transocean's captain, James Stewart, who was in charge of the *Deepwater Conqueror* at the time of the incident and could testify to Transocean's control over operations, his direct orders to Santee, and Santee's integration with the crew. ROA.1537. Santee also requested targeted documents bearing upon Transocean's active control over operations, including:

- Transocean's daily reports to Chevron, which specifically addressed ROV operations and Santee's work;

- Policies and procedures regarding Ultimate Work Authority (final decision-making authority regarding unresolved safety conditions, *see* ROA.1799), Person in Charge (final decision-making authority in emergencies, *see* ROA.1801), Planning & Risk Assessment Prompt Cards (Transocean-mandated risk-assessment cards required for every job, *see* ROA.2168, 2181), and verification of compliance with Transocean's contractor program;

- Manuals on employee training, responsibilities, operations, procedures, maintenance, training, and safety (including those stored in Transocean's database); *and*

- Documentation of hazard analyses, safety meetings for six months before and after the incident; records of Transocean's control of ROV maintenance work; and records of similar previous incidents.

ROA.1538-40. Collectively, this discovery bore directly on Transocean's breach of its active-control and turnover duties.

This requested discovery also was critical for further establishing Transocean's breach of its duty to intervene, which would have further demonstrated—by direct or additional indirect evidence—Transocean's actual knowledge of Oceaneering's improper cursor-pin changeout procedures based on its daily "pre-tour meetings" with all maritime workers and related reports. *See* ROA.2182-83; *Pimental*, 965 F.2d at 16.

Simply put, obtaining this crucial testimony and these key documents could have—and indeed would have—"affect[ed] the outcome" of the summary-judgment calculus here. *Biles*, 714 F.3d at 894. After all, "when a party is not given a full and fair opportunity to discover information essential to its opposition to summary judgment, the limitation on discovery is reversible error." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 720 (5th Cir. 1999). Especially under the liberal standard for granting Rule

56(d) motions, the district court committed just such an error here, thus requiring reversal. *Biles*, 714 F.3d at 894; *see also, e.g.*, *Winfrey v. San Jacinto Cnty.*, 481 F. App'x 969, 982-83 (5th Cir. 2012) (district court abused its discretion in "not ordering the production" of essential discovery, given the "specificity" of the plaintiff's request).

## IV.   The district court erred in granting summary judgment for Chevron, as genuine issues of material fact exist as to its control over the vessel.

The district court likewise erred in granting summary judgment to Chevron. Its opinion ignores genuine issues of material fact as to Chevron's operational control over (or implied authorization of) Oceaneering's actions. It also disregards evidence showing that Chevron exercised at least partial control over the vessel, by which it undertook a seaworthiness duty. Alternatively, the district court abused its discretion in granting summary judgment after wrongly refusing to permit Santee greater discovery on these crucial issues.

### A.   Chevron owed a duty to Santee because it contractually authorized and controlled Santee's work.

Chevron retained contractual control over Santee's work—or, at least, impliedly authorized Oceaneering's negligent actions, thus supporting his

negligence claim. The district court's contrary conclusion rests on viewing the evidence in the light most favorable to *Chevron*, not Santee. ROA.2383-85.

Whether under Louisiana or general maritime law,[9] a "principal is 'not liable for the torts of an independent contractor unless the principal [1] exercises operational control over or [2] expressly or impliedly authorizes the independent contractor's actions.'" *Henderson v. Atmos Energy Corp.*, No. 21-30046, 2022 WL 3657191, at *1 (5th Cir. Aug. 25, 2022) (per curiam) (Louisiana law) (quoting *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 270 (5th Cir. 1992)); *accord Chiasson v. Brand Energy Sols., LLC*, 439 F. Supp. 3d 816, 823 (W.D. La. 2020) (maritime law) (citing *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471 (5th Cir. 1989)). Assessing a principal's duties thus requires "an examination of whether and to what extent the right to control work has been contractually reserved by the principal." *Echeverry*, 988 F.3d at 232. It also requires the court to consider "the supervision and control that is actually exercised[.]" *Id.* If the contractor is "not entirely free to do the work in his own way[,]" the principal retains operational control. *Id.*

---

[9] Although Chevron said that it sought application of "federal maritime law" (ROA.698), it relied on Louisiana law. *See, e.g.*, ROA.700 (citing *Fruge ex. rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003) (applying Louisiana law)).

Courts and juries commonly find such operational control. *See, e.g.*, *id.* (affirming jury verdict on operational control theory for injuries to pedestrian who was struck by manlift operated by independent contractor to remove birds from trees outside casino). For example, when a principal's contract requires the contractor's compliance with "safety instructions" and its "company man" performs actual safety checks, genuine issue of material fact exist "as to who had operational control." *Id.* (citing *Denson v. Diamond Offshore Co.*, 955 So. 2d 730, 733–35 (La. App. 4 Cir. 2007)). Operational control may also exist when the principal supplies equipment and safety personnel, and has employees attend safety meetings. *Id.* at 233.

As in *Denson* and *Echeverry*, Chevron's contract with Oceaneering, service order, safety guidelines, and conduct toward Oceaneering reflect its retention of operational control or implicit authorization of Oceaneering's work. To this end, the district court entirely ignored abundant evidence that Chevron imposed exacting contractual control over Oceaneering. Chevron mandated compliance with detailed safety requirements and joint development of standard operating procedures. *See, e.g.*, ROA.1903 (Chevron reserved the unconditional right to "prescribe measures to Contractor [Oceaneering] to achieve compliance" with Chevron safety requirements; and

requiring that Oceaneering "*implement steps to achieve compliance*")
(emphasis added); ROA.1878-79 ("jointly developed standard operating
procedures). It imposed equally detailed monitoring requirements. *See, e.g.,*
ROA.1743-44 (requiring completion of "ROV Pre-Dive Checklist" "for each
dive"; "dive logs for each dive"; "[d]ata and reports necessary to monitor the
Work being performed"). And it even required the permanent retention of
Santee and other ROV personnel. ROA.1748-49 (Chevron reserving "the right
to request" that "certain individuals"—including the ROV Supervisor (here,
Santee) be "deemed key personnel for the *entire term of this Service Order*"
who may not be re-assigned without Chevron's prior written approval)
(emphasis added).

Disregarding all of this evidence, the district court instead leaned on
Chevron's isolated contractual carve-out purporting to assign to Oceaneering
"complete control" over its activities. ROA.2383-85. But that provision is
belied by numerous other provisions by which Chevron seized and reserved
operational control to itself. *E.g.*, ROA.1039, 1054, 1058, 1740, 1852, 1878-
79, 1904, 1933, 1941; *see also Brock Services, L.L.C. v. Rogillio*, 936 F.3d 290,
298 (5th Cir. 2019) (ambiguous contract provisions to be construed against
the drafter and parol evidence may be considered). At minimum, genuine

factual issues exist as to Chevron's retention of operational control, whether by contract or acts.

### B. Chevron's actual conduct demonstrated control and authorization of Oceaneering's negligent work.

Chevron also exerted actual operational control and directly authorized Oceaneering's work, exercising its contractual rights. *See, e.g.*, *Echeverry*, 988 F.3d at 228. When asked "Who has control over Oceaneering while they're onboard the *Deepwater Conqueror*?", Transocean's corporate representative did not say that Oceaneering employees were free to do the work in their own way. Instead, he explained that "they take instruction *from Chevron*" (ROA.2169-70) (emphasis added) and "report[ed] to Chevron." ROA.2171.

Chevron also retained control over drilling operations, directly affecting Santee's ROV work. ROA.1825-26. Chevron mandated the *Deepwater Conqueror*'s location. ROA.1842-43. It specified where the ship was authorized to drill. ROA.1790, 1792. And it mandated "what the daily operations are and the sequence of what we're doing." ROA.1776.

As Chevron's corporate representative agreed, Chevron (through its lead drill ship representative or drill ship representative) "was in charge of safety along with Transocean's captain." ROA.1883. As a result, Transocean and Chevron were obligated to immediately notify the other party of

operations that could not be safely undertaken or of hazardous conditions. ROA.1875, 1975-76. To that end, Chevron continuously provided Health, Safety, and Environment representatives on the *Deepwater Conqueror*, who enforced Chevron's safety requirements and assumed partial responsibility (at minimum) for the safety of all onboard. ROA.1824, 1835, 1847-48, 1850-51.

Taken together, when viewed in a light most favorable to Santee—and contrary to the district court's conclusion—the above evidence of Chevron's contractual control and actual or implied authorization of Oceaneering's methods demonstrate that Chevron gave direct input into "*how* Santee was to perform th[e] activity" leading to his injury. ROA.2384 (emphasis in original). Although Santee indeed acted as a supervisor for other Oceaneering employees as the district court pointed out (ROA.2385), the court improperly concluded that Santee acted within a vacuum, not subject to Chevron's close oversight and authorization. As a result, Santee *not* "free to do the work his own way." *Fruge*, 337 F.3d at 561; *see also Denson*, 955 So. 2d at 733-35; *Echeverry,* 988 F.3d at 233. The court's contrary conclusion requires weighing the evidence in the light most favorable to Chevron, not Santee.

## C. Chevron breached its duty to ensure the safety of Santee's work.

Although the district court did not address the element of breach, Santee equally presented sufficient evidence of this element to survive summary judgment.

Despite mandating and directly reviewing Oceaneering's policies and procedures for its work on the *Deepwater Conqueror*, Chevron then impliedly authorized Oceaneering's flawed cursor-pinning work, which led to Santee's injury. *See* ROA.1852 (Chevron corporate representative acknowledging his review of Oceaneering's policy and procedure regarding safety); ROA.1885-86 (testifying that the LARS deck is a "deck on the vessel" and that the deck did not accommodate proper pinning of the cursor pin). Chevron's oversight is illustrated by its post-incident efforts to address the systemic issues in Oceaneering's work:

**From:** Stueben, Brian <Brian.Stueben@chevron.com>
**Sent:** Thursday, August 4, 2022 7:25 AM
**To:** Taylor, Troy <TTDK@chevron.com>
**Subject:** ROV Curser pIn

- How often is the curser pin replaced? After every ROV run? Every 3 months? Every 6 months?*[Troy Taylor]* The curser pin is replaced quarterly on average.

- When stabbing the pin ladder positing was limited due to a small grating area on platform area. Has this been addressed? A work platform built or grating extended?*[Troy Taylor]* See Cursor pin installation / removal procedure attached.

- When stabbing the curser pin has another means been identified to reduce or eliminate exposure to personnel?*[Troy Taylor]* No other means identified per ROV Supervisor.

ROA.2030. And were more necessary, Chevron's representative later acknowledged that Santee did not believe his method of pinning the cursor was hazardous, and that Chevron failed to warn Oceaneering workers about the LARS deck and the need to use a different ladder and method. ROA.1866, 1899.

Given Chevron's retained control and authorization of Oceaneering's negligent approach, it owed and breached its duty of reasonable care to Santee. *See Denson*, 955 So. 2d at 733-35; *Echeverry,* 988 F.3d at 233. At minimum, genuine issues of material fact exist. Summary judgment on Santee's negligence claim was improper.

### D.    Chevron is liable for unseaworthiness because of the control it exerted over the vessel, or at minimum genuine issues exist.

The district court equally erred in granting summary judgment for Chevron on Santee's unseaworthiness claim. The record shows Chevron's continuous control over the vessel, including its location, drilling operations, objectives, safety, and methods exposes it to unseaworthiness liability.

A vessel owner must "provide a seaworthy vessel" by ensuring that the "vessel and its appurtenances" are "reasonably fit for their intended uses." *Luwisch*, 956 F.3d at 326 (citations and quotation marks omitted). And when a vessel owner transfers "possession and control" to another who then

"furnishes the crew and maintenance for the vessel[,]" liability for unseaworthiness attaches to the transferee. *Forrester v. Ocean Marine Indem. Co.,* 11 F.3d 1213, 1215 (5th Cir. 1993).

That is the case here. Chevron exerted control over the vessel—both through shoreside and onboard personnel—furnished its crew, and provided for its maintenance (both through contracts with Transocean), thus constructively possessing the vessel. *See, e.g.*, ROA.339, 712, 1660-61, 1743-44, 1748-49, 1878-79, 1903, 1878-79. Thus it matters not (as the district court observed) that Chevron had limited personnel aboard the vessel. ROA.2386. Rather, viewing all facts and inferences in Santee's favor—and construing Chevron's contractual provisions against it as the drafter—Chevron constructively possessed and controlled the *Deepwater Conqueror*, rendering it liable for the unseaworthiness causing Santee's injury. *See Luwisch*, 956 F.3d at 326; *Forrester*, 11 F.3d at 1215. At minimum, genuine issues of fact exist, precluding summary judgment here.

## E. Alternatively, the district court abused its discretion in denying Santee's motion for continuance.

Just as the district court improperly decided Transocean's motion for summary judgment while denying Santee a "full and fair opportunity to discover information essential to [his] opposition to summary judgment," it

committed the same error as to Chevron's motion. This alternative, but no less significant, error requires reversal.

Santee sought to depose three key fact witnesses: Chevron's drilling superintendent—who could testify about the vessel's operations, work, and the relationships between the parties in this suit—and Chevron's two Health, Safety, and Environmental specialists on board at the time and shortly after Santee's injury. ROA.1537. As Santee explained, their testimony would prove Chevron's day-to-day authorization, reporting, monitoring, and control over Oceaneering's work, the LARS deck, and the negligent conduct here, thus easily affecting the outcome of Chevron's motion. *See* ROA.1537.

Without explanation, the district court summarily denied Santee's targeted request. ROA.2349. In doing so, it ignored that such requests "should be liberally granted[.]" *Biles*, 714 F.3d at 894. And because that discovery affected the outcome of Chevron's motion, the court's denial constitutes an abuse of discretion.

## CONCLUSION

For these reasons, this Court should reverse the district court's order denying Santee's motion to remand, vacate the court's later orders granting Defendants' motions for summary judgment for lack of jurisdiction, and order this case remanded to state court.

Alternatively, the Court should reverse the district court's orders granting Defendants' motions for summary judgment and remand for further proceedings.

*Dated: July 6, 2023.*                    Respectfully Submitted,

                                           ARNOLD & ITKIN LLP

                                           *s/ Andrew R. Gould*
                                           Kurt B. Arnold
                                           Andrew R. Gould
                                             *Counsel of Record*
                                           Brian M. Christensen
                                           ARNOLD & ITKIN LLP
                                           6009 Memorial Drive
                                           Houston, Texas 77007
                                           (713) 222-3800 Telephone
                                           (713) 222-3850 Facsimile

                                           **Counsel for Plaintiff-Appellant**
                                           **Shanon Roy Santee**

## Certificate of Service

I certify that on this date, an electronic copy of this document was served by notice of electronic filing using this Court's ECF System upon the following opposing counsel of record:

Thomas C. Wright
Raffi Melkonian
Kelley Clark Morris
  Wright Close & Barger, LLP
One Riverway, Suite 2200
Houston, Texas 77056
(713) 572-4321 *Telephone*
(713) 472-4320 *Facsimile*
wright@wrightclosebarger.com
melkonian@wrightclosebarger.com
morris@wrightclosebarger.com

Robert L. Klawetter
  Eastham, Watson, Dale & Forney, LLP
808 Travis Street, Suite 1300
Niels Esperson Building
Houston, TX 77002
(713) 225-0905 *Telephone*
(713) 225-2907 *Facsimile*
rklawetter@sbsb-eastham.com

Michael Anthony Golemi
  Liskow & Lewis
1001 Fannin Street, Suite 1800
First City Tower
Houston, TX 77002
(713) 651-2914 *Telephone*
(713) 651-2908 *Facsimile*
magolemi@liskow.com

Alejandro Mendez-Roman
Thomas R. Nork
  Holman, Fenwick & Willan USA, LLP
5151 San Felipe Street, Suite 400
Houston, Texas 77056
(713) 706-1955 *Telephone*
(713) 953-9470 *Facsimile*
alex.mendez@hfw.com
tom.nork@hfw.com

Michael John Wray
  Squire Patton Boggs (US), LLP
600 Travis Street, Suite 6700
Chase Tower
Houston, Texas 77002
(713) 546-5850 *Telephone*
(713) 546-5830 *Facsimile*
michael.wray@squirepb.com

s/ Andrew R. Gould
Andrew R. Gould
*Attorney of Record for Plaintiff-Appellant Shanon Roy Santee*
Dated: July 6, 2023.

## CERTIFICATE OF COMPLIANCE

1.   This document complies with the type-volume limitation of Fed.
     R. App. P. 32(a)(7)(B) because this brief contains 12,971 words,
     excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.   This document complies with the typeface requirements of Fed.
     R. App. P. 32(a)(5) and the type-style requirements of Fed. R.
     App. P. 32(a)(6) because this brief has been prepared in a
     proportionally spaced typeface using Microsoft Word in 14-point
     XCharter font.

s/ Andrew R. Gould
Andrew R. Gould
*Attorney of Record for Plaintiffs-*
   *Appellants*
Dated: July 6, 2023.
